AMY RICKEY, by her next friend, *v.* JOSFPH H. DAVIS, and others.

Bill by one of the next of kin, against the administrator of an intestate, and the other next of kin, for a distributive share of the personal estate. The defendants set up a release executed by the complainant of all her share in the estate. The release was declared void under the proof made of the want of mental capacity in the complainant to make a valid release.

On the 4th of March 1846, Amy Rickey, who, as the bill states, being aged and infirm and incapable of managing her affairs, sues by Timothy Abbott Junior, her next friend, exhibited her bill, stating, that Mary Olden, late of Princeton, died in Feb. 1844, and was at the time of her death possessed of and entitled to a considerable personal estate, greatly more than sufficient to pay her debts; and that the said Mary Olden died intestate and without issue, leaving the complainant, her paternal aunt, and Deborah Cooper, her maternal aunt, and Mary Anne Eastburn, Francina Ely, Joseph Ely, Bennington Ely, William Ely, Susan Olden, Joseph Olden and Samuel Olden, her nieces and nephews, her next of kin her surviving.

That sometime after the death of the said intestate, one Joseph H. Davis obtained letters of administration of her goods, chattels &c., and by virtue thereof possessed himself of her personal estate, to a large amount, that is to say, the sum of———thousand dollars, or thereabouts, as the complainant is informed and believes, more than sufficient to pay her debts &c., which surplus became distributable among the complainant and the said other of the next of kin of the said intestate, in equal shares; the complainant being entitled to one tenth part thereof.

That, being so entitled, the complainant had frequently and in a friendly manner, by herself and others applied to the said administrator and requested him to come to an account with the complainant of the personaal estate of the said intestate, and to pay her the tenth part of said surplus.

That the said Deborah Cooper and the other of the said next of

kin (naming them) severally refuse to join with the complainant in this suit, under the pretense that thay have been fully paid their shares, and that the complainant is not entitled to any part of said estate, or some other pretense which they refuse to discover.

The bill prays an account of the estate of the intestate, and that the same may be applied in a due course of administration, and that the complainant may be paid her share thereof; and for such further and other relief &c. The administrator and the said other next of kin are made defendants.

Joseph H. Davis, the administrator, in his answer admits the death, &c.; and that he possessed himself of all the personal estate of the intestate, to the amount set forth in the first schedule to his answer. That the personal estate was much more than sufficient for the payment of debts and expenses, and that the surplus became distributable as stated in the bill; and that the complainant, as one of the next of kin, would have been entitled to the one tenth part of the surplus if she had not, in the manner after stated, executed a release of all her interest in the same.

He says that there were in the possession of the intestate, at the time of her death, three separate instruments of writing each of which purported to be the last will of the said Mary Olden; one of which was in the hand writing of and signed by the said Mary Olden; another in her hand writing and sealed but not signed; and the third was in the hand writing of her brother, David Clark.

That by these several wills, or instruments of writing, the whole of her estate, with the exception of some small pecuniary legacies, was given to her nieces and nephews, no part thereof being given to either of the aunts, the complainant and the said Deborah Cooper.

That this defendant having married a niece of the said Mary Olden, and his wife having died a very short time before the death of the said aunt, he was chosen as the adminitrator by those who were interested in the estate. That, as soon as it was understood by the nieces and nephews that the complainant and the said Deborah Cooper were each entitled by law to an equal share of the estate, this defendant was requested to call upon the complainant to state to her the circumstances of the case; to apprize

her of her legal rights, and to ascertain whether she was willing to execute a release of any claim she might have by law to a share of the said estate.

That in compliance with this request, and without having any personal interest in the matter, he, together with Josiah S. Worth, whom he had desired to accompany him, went to the house of Joseph Abbott, a few miles from Trenton, whose wife, Anna Abbott, was the daughter of the complainant, and with whom the complainant was then residing. Having called out Anna Abbott and Joseph Abbott, her husband, into the hall, this defendant stated to them the object of his visit, and entered into a full explanation of all the circumstances of the case, the contents of the wills, the fact that Mary Olden had died without having formally executed them, and that the complainant, being an aunt of the said Mary Olden, was entitled by law to a share of the personal estate. He told them he had come for the purpose of learning what their views and wishes upon the subject were, and what the complainant would be disposed to do in reference to the matter. Anna Abbott replied, on the part of her husband and herself, that they would not have their mother to take any portion of the estate ; that it was not their wish that she should do so ; that she did not need it ; and that it was never intended for her. This defendant then asked Anna Abbott what he should do ; and she told him to go in and mention the matter to her mother. That this defendant thereupon went into the room where the complainant was sitting, and there, in the presence of her daughter, Anna Abbott, her son-in-law, Joseph Abbott, and the said J. S. Worth, he mentioned to her the circumstances of the case, repeating substantially the statement he had previously made to Anna and Joseph Abbott, and informing her that by law she was entitled to a share of the personal property of the said Mary Olden. She replied that she did not want it, and that it was never intended for her ; and then turning to her daughter and son-in-law she asked them what they thought of it. Anna Abbott replied " we think so too, mother." This defendant then stated that he had brought with him a release for her to sign if she thought proper to do so ; and after having read it aloud to her and in the hearing of her daughter and son-in-law,

she without hesitation signed it; the said Joseph Abbott and Joseph S. Worth subscribing their names as witnesses thereto. That this release, now in this defendant's possession, is in the following words :

" Know all men by these presents that I, Amy Rickey, of &c., being the aunt and one of the heirs at law of Mary Olden, of &c., lately deceased, for and in consideration of the sum of ten dollars to me in hand paid by Joseph H. Davis, administrator of the said Mary Olden, deceased, have and by these presents do remise, release and forever quit claim unto the said Joseph H. Davis, administrator as aforesaid, and to each and every of the heirs at law of the said Mary Olden, deceased, and to his and their and each of their heirs and assigns, all manner of claim which I now have or might have to any share or portion of the estate of the said Mary Olden, deceased, as one of the heirs at law ; and that I do remise, release and forever quit claim unto the said Joseph H. Davis, and to each and every of the heirs at law of the said Mary Olden, deceased, and to them and each of their heirs and assigns, all rights or demands whatever which as heir at law or otherwise I now have or might have in law or equity to any share or portion of the estate of the said Mary Olden deceased.

In witness whereof I have hereunto set my hand and seal this first day of March A. D. 1844.

AMY RICKEY, [L. S.]

Sealed and delivered in the presence of

JOSEPH ABBOTT,

JOSEPH S. WORTH.

That, after the execution by the complainant of the said release, and on or about March 6th, 1844, the said Deborah Cooper also executed a release of all her interest in the estate of the said intestate, and of every claim that she might have by law against the same ; which last mentioned release, signed and sealed by the said Deborah, in the presence of two witnesses who have attested the execution thereof, this defendant has, & c.

He admits that the complainant has made such applications and requests to him as in the bill are in that behalf mentioned, or to such purport and effect, but in consequence of the execution of

the said release by the complainant he has declined &c. ; never-theless, this defendant is willing and desirous to act in the prem-ises, as administrator , as aforesaid, under the direction and indemnity of this Court.

That he has, in the schedules annexed to his answer, set forth a true and particular inventory and account of the estate.

The inventory of the personal estate, purporting to have been made Feb. 29, 1844, is  - - - -     $12,361 84

| | |
|---|---:|
| Silver found after appraisement,  - - - | 205 00 |
| Sales over appraisement,   - - - | 150 04 |
| Cash owed by J. H. Davis not appraised,  - | 100 00 |
| | $12,816 88 |

He then gives an account, including dividends and interest re-ceived up to July 1848, amounting to  -   $14,140 71, and gives an account of payments amounting to  -  . $482 94.

### TESTIMONY.

*Jos. Abbott,* a witness for complainant.—The complainant is his wife's mother; she is either 88 or 89 years old last month, (witness was sworn Dec. 1, 1846.) Witness remembers that Mr. Davis, one of the defendants, and J. S. Worth came to de-ponent's house some time after Mary Olden's death, between 12 and 1 o'clock of the day. He and his wife were going to a funeral. We met at the door. I think we had not more than got into the hall before Mr. Davis stated that mother-in-law was entitled to a share of Mary Olden's estate, as she had died intes-tate. He went on to say that she had made two or three wills. He then said she had made one will. I think it was the last one she made. He said her friends found her so unwell in the even-ning that they did not think it right for her to sign it, and that she had better leave it till morning, when she might be better ; and she was then so ill in the morning that she never did sign it. Witness, upon recollection, says it was after he spoke of the last will above mentioned that he spoke of her having made two or three other wills. The impression on witnesses's mind at the time was that the last will above mentioned was made at the time

when she was so ill, just before her death, or a day or two before. Does not remember that anything was said as to the time when the will was prepared; but that is the impression he was under. Mr. Davis mentioned the fact that she was thought too unwell one night to make it, and left it till the morning, and she never got better. Mr. Davis wanted to know if under these circumstances I was willing my mother-in-law should assign her right away. Something was said by Mr. Davis as to my wife being spoken to about it. He said that all the heirs had agreed to sign off or release their claims excepting Sam'l Paxson. He said that in the will which had been made his (Davis's) wife and her child had been left a considerable amount, and if the will was not carried out they would not fall heir to any of it. After Mr. Davis had seen deponent's wife, they got together and concluded that we should have a repugnance to the will not being carried out as was intended, and determined to advise my mother-in-law to sign off her claim. We agreed that it should be done so: advising her to do it was of no importance as she was not competent to judge respecting it. Our motive for agreeing to this was our impression that the will was made so; and we wished to carry out the intention of the will; that was mine and my wife's understanding at the time; and it was our desire that the will should be carried out. By the will here spoken of I mean the will made just previous to her death, as represented by Mr. Davis. Mr. Worth was not present at this conversation between witness and Mr. Davis at first. We went into the room after this conversation in the hall, and Mr. Worth was then present. Mother-in-law was in the room. Something was said to her about signing the release. I think by myself. I explained the object of Mr. Davis's coming there. I proposed to her to sign it. She looked up and said, " Shall I sign it?" We told her of course to sign it, and she did sign it. Mr. Worth and I witnessed it. It was either before or after signing it that Mr. Davis undertook to read it to her; perhaps it was before signing; and he read a few lines, perhaps two or three lines of it to her; and it was evident she did not understand it; and he then undertook to explain what he had been reading. I told him it was evident she could not understand it. He said he would read on some

more. He did so, and undertook to explain that again; and I told him there was no use in explaining it, as she could not understand it, and he then gave it up and did not try it again; and whether he went on to read the remainder I cannot remember; but he did not undertake to explain it. I think, however, that he did read the remainder, but do not feel confident. They expressed a wish to get back to Trenton as soon as possible, as they said their dinner was waiting for them; and my wife and I wished to be off to the funeral. After the instrument was signed and witnessed, as Mr. Davis was going out, he said he thought he would give her $5. Just as he was going out of the door Mr. Worth said he had better make it ten. Davis then came back and presented the $10 to my mother-in-law, or rather he spoke to her and said he would give her $10. She looked up at him and asked him what it was for. He said he wanted to make her a present of it. She told him she was much obliged to him. Very shortly after that they left the house. They were at the house, witness thinks, about half an hour. My mother-in-law had lived at my house about 15 years when this occurred. She had an attack of sickness about two weeks previous to this occurrence. The attack was something similar to palsy; rush of blood to the head. The Doctor bled her and relieved her. At the time of the occurrence above stated. witness says he does not think she was competent to transact any business; it was very clear to him; and he expects it must have been clear to others. It was not more than 2 or 3 hours after that she stated to witness that Mary Olden had made a will and left her ten dollars. Witness heard her repeat the same thing afterwards several times; for weeks afterwards it seemed to impress her mind very strongly. When she talked so witness would try to explain to her how it really was, and she would seem to understand it for a moment; but afterwards it was all gone again, and the old thing returned again. It was doubtful to witness whether she understood it at all; she looked up with that expression. She said nothing to witness that satisfied him that she understood it; nothing of her own accord. She said nothing in answer to witnesses's explanations that satisfied him she understood it. Once or twice, within two or three weeks after the occurrence, she asked if Mary

Olden was dead; and upon being told she was, she then repeated that Mary Olden had left her $10. At the time when the paper was signed witness had no expectation or belief that she understood the nature of it. He does not think she was qualified to do any business for a year before she had the attack above mentioned. She would know her friends; but almost as soon forget them. After that attack she was much worse. Her mind was almost gone except for a few moments; it was wandering, or nearly so. We invited Mr. Davis and Mr. Worth to dine with us, but they said (as before.) Mrs. Rickey's mind has been growing worse since; slowly, of course, or it would have been entirely gone long ago. Mr. Davis brought the release with him, prepared.

*Cross Examined.* Witness thinks he met Mr. Davis and Mr. Worth at the door. Mr. Worth went on into the room; and the conversation between witness and Mr. Davis took place in the hall. I think it possible we might have gone into the room and then come back into the hall; but I cannot remember distinctly. I think it most likely we went into the room first. Mrs. Abbott was not in the room first, she was in the opposite room. Recollects the circumstance that Mr. Davis stated to witness that he wished to have some conversation with him and wished him to step aside. Mrs. Abbott was not with witness at that time. She was not present at the conversation in the hall during the first part of it. She was present during the latter part of it; she was called in. Mr. Davis proposed that she should be present. Thinks it probable she remained during the conversation. Mr. Davis asked Mrs. Abbott what he had better do; and she said that he, Mr. Davis, had better go in and mention it to mother-in-law. Does not recollect what was said by Mr. Davis to mother-in-law; it made no impression on witness mind; he did not consider it of any importance. Cannot recollect whether mother-in-law said any thing or not; expects she did say something besides what witness has mentioned in his examination in chief, but he cannot remember what it was. Thinks that Mrs. Rickey's inability to transact business arose from loss of memory previous to the attack above mentioned. That attack affected her faculties. Her mind after that wandered, so that she did not know her

nearest friends. This continued to be the case up to a short time before the signing. When the paper was signed she had just begun to revive a little, so as to know her friends. Witness's opinion is that when she signed the release she did not know the nature of the act she was doing. When I explained to her, as before mentioned, the nature of what she had done, I doubt whether she had any idea of what she had done; if she had it was gone in an instant. She knew Mr. Worth and Mr. Davis.

*John R. Abbott,* for complainant. Is a son of Jos. Abbott; complainant is his grandmother. He lives with his father, and lived there in March, 1844. Remembers his grandmother's having an attack of sickness about Feb. 15, 1844. Grandmother had been extremely childish for a year or more before that attack ; so much so that it had been common in the family to say in a jocular way, " as childish as grandmother." She was worse after that attack, decidedly. On or about March 1, 1844, in his judgment, she was totally unfit to transact any business. He left home for Trenton on the morning of the day on which the release was signed. He saw his grandmother that morning before he left home. While he was getting ready she asked him if he was going home. Before he could answer, she desired him to ask his father to send for her—she was anxious to get home. Witness told her she was at home. She said she was not, that she was at Nancy Evan's, and she wanted to get home. After he got back from Trenton he saw her again ; having immediately gone into the room where she was. She told him that Hugh Ely had been there and had made her a present of $10. Witness knew Mr. Davis had been there and supposed she meant him. He asked her what it was for. She said it was for signing Mary Olden's will. Witness told her Mary Olden left no will. She then said it was for putting her name to a piece of paper— she did not know what it was about. The next day she frequently stated that she had signed Mary Olden's will, and that Mary Olden had left her $10. Frequently about that time she would ask witness what he considered the money was for ; he endeavored to explain it to her ; but she said she did not understand it. She asked him about that time, shortly after signing the release,

several times during the course of a week, how long she had been there. He told her 15 years. She appeared to look up with great suprize, and remarked, oh, I thought I had been here but 2 or 3 weeks. The second day before she had the attack above mentioned, witness and his sister were sitting in the room with her, and she pointed to witness, and asked his sister if that was one of her family. His sister told her it was John. What, she remarked, "is it thy son John." Witness was in her room the day before the release was signed. She asked him if he had just come to town, and wanted to know how they all were at home. About that time, witness thinks it was the same occasion, she said that cousin Nancy had been very kind to her, but that she wanted to get home; she did not want to trouble her any longer. The day before the release we were sitting in the room together and witness asked her if she knew who that was, pointing to witness's mother. She said she did, it was Nancy Evans. From witness's knowledge of her and his intercourse with her, he is satisfied that at the times above stated, or the day before the release was signed, or the day it was signed and the day after, she was entirely incompetent to understand or transact any business of the kind. She was not competent to transact any business of a monetary nature. In his opinion she was not at those times competent to make any contract or any disposition of property; and this incompetency proceeded, in his opinion, from inability of mind to understand, and not from mere debility of body. This incapacity has continued from that time and still continues : she is nothing more than an infant now as regards intellect. Mr. Davis was at father's house about a week before the release was executed, on a visit, with two young ladies with him, connections of the family. It was after grandmother had the attack above mentioned. They were there two hours, probably. I was not in the house with them.

*Cross Examined.* He is in his 40th year. The attack was in the nature of paralysis. She had never had a similar attack before. A physician was sent for, but not till the next morning. The physician was Dr. Taylor, of Trenton. Generally, grandmother knew the different members of the family for a moment,

for the most part. When friends came there she would not always recognize them at first. She would not know them at first when they came in. Some one must introduce them, and then she could recollect them. After the attack, up to the time when the release was signed, she would look up with a smile as if she knew them ; but could not call them by name. This took place with the neighbors and friends. Her speech was affected by the attack she had. She grew better some weeks after the attack. She never recovered as well as she had been before the attack. For a year before the attack she had not visited any where. He has no recollection of her having been in Trenton a year prior to the attack. She went to Trenton once after the attack. She came up and got out at Isaac Barnes's. She was in the habit of calling the members of the family by name, generally ; but frequently made mistakes, as she sometimes called witness Ephraim ; he had a brother Ephraim. His sisters, one or more of them, occupied the room with grandmother. Witness wrote a letter to Mr. Davis sometime after the paper was executed. The Nancy Evans referred to is a first cousin of witness's mother, and was called cousin Nancy in the family, by some.

*Sarah D. Norton,* for complainant. Has known Mrs. Rickey and lived neighbor to her many years, perhaps twenty. Has been in the habit of seeing her and visiting her very often. In the course of three or four years I have seen her sometimes twice a week, sometimes once in two or three weeks, sometimes once a month, and sometimes once in two or three months. Remembers her having an attack of sickness in 1844 : she was very ill at that time ; it was in Feb. Saw her frequently about that time. She continued sick several weeks I think. I think she was out of her mind by times altogether. There were certain questions she would ask me when I went to see her ; and I could tell by that she was not in her right mind. At one time when I went to see her she asked me how long I had been married ; she asked me that question two or three times in 15 or 20 minutes. I had a daughter married a short time before that, and had taken her a piece of the wedding cake : it was then she made the inquiries. And then, in a few minutes, she asked, when you moved up there ?

Before that, she knew my daughter had been getting married. She did not ask when my daughter was married; but when witness was married. This was about Feb., 1843: about a year before the attack of sickness. After the attack, in 1844, I think her mind was worse at times. Her mind has continued pretty much in the same way up to the present time; but I think she is worse the last year, since she has had more of the spells. For some weeks after she had the spell of sickness in 1844, I should not think she was capable of doing much business, at any rate, according to my weak judgment. I saw her a day or two after the attack: she was in bed. I rather think that was the first attack of the kind she had ever had. From my intercourse with her I think her mind is weaker since that attack than it was before. At times she would appear out of her mind; at times she would appear rational; and then she would not appear to know what she was talking about. I remember hearing about the execution of the release; hearing the family speak of it. I remember that she was not in her right mind about that time.

*Cross Examined.* I think it was just after she had the spell that I first heard about the paper. I heard such a paper had been signed; but did not learn when it was done.

*Susan Abbott,* for complainant. Is a daughter of Joseph Abbott, and grand daughter of the complainant. She lives with her father, and lived there in 1844. Remembers Jos. H. Davis and Josiah Worth being at father's house about the 1st of March of that year. My grandmother was taken sick about the middle of Feb. of that year. For several days after, she was so that she could not speak so as to be understood. Her speech seemed to be affected by the attack. She was very feeble and helpless for a few days after the attack. After that, she was so that she could walk about the room. The first time she came down after the attack was the day Mr. Worth and Mr. Davis were there: she was brought down in consequence of their being there. While she was up stairs after that attack and before she was brought down, she thought she was not at home; thought she was at Nancy Evans's, and called me Nancy all the time. Nancy Evans

is Evan Evans's wife, and lives in Trenton; and was a niece of the old lady by marriage. After Mr. Worth and Mr. Davis were there, and after that first attack, her mind has been gradually failing. She has had a number of those attacks since; six or seven I think. I was in the room several times while Davis and Worth were there, passing through; I did not stay. I saw, as I went into the room, Mr. Davis standing by the old lady with a paper, attempting to read it. He attempted to read it several times, and was interrupted by my father telling him that she could not comprehend it. He then gave it up after reading two or three lines. Witness did not see the paper signed ; was not in at the time. When witness went in again Mr. Davis was standing by her with a bank note. He handed it to her, and she took it and asked him what he gave her that for ; and he said, " I make you a present of it." He then turned from her and said, " I make her a present of this ten dollars out of my own pocket." I should think she was not then in a situation to enable her to comprehend or transact business. Remembers Mrs. Clark and Miss Hughes being at her father's in July 1845 ; she was at home. Thinks they got there between eleven and twelve o'clock. Thinks they left about four in the afternoon. Was in the room occasionally while they were there. Witness took it it was a friendly visit to them all. They dined there. Don't recollect that grandmother said a great deal while witness was in the room. Mrs. Clark remarked to witness how much aunt Amy was like her, Mrs. Clark's mother ; that her mother would often go and get her bonnet and shawl and dress herself up and say she was going home. That was her home and had been for several years. She would then go to a drawer and get shawls and caps and dress herself up in a ridiculous manner ; so much so, she said, she locked up her drawers to keep her from them. Grandmother was continually talking that she was going home ; talked so at that time, while Mrs. Clark was there. Witness heard her talk so. It was that that induced Mrs. Clark's remarks above mentioned. Grandmother has frequently made such remarks—that she was not at home, and wanted to go home—since that attack, and does it still almost every day. While we were standing at the door, as the carrriage drove off, and before they got out of the lane, I

asked grandmother who they were, and she said she did not know, could not tell. She always says, when any body comes, that she knows them, when they speak to her ; and when they are gone she can't tell who they were. This was so when Mrs. Clark was there ; and is so still ; and has been so ever since. Josiah Worth is an own uncle to the children of Benjamin Olden, three of the defendants.

*Cross examined.* Before the attack her memory was considered pretty good for an old person. It continued to be pretty good up to the period of that attack. Don't recollect hearing her complain of her memory being very bad before that attack. Don't recollect before that that I ever heard her call persons by the wrong name. She never called me Nancy Evans before that attack. Up to the period of that attack I don't think there had been any decay of her faculties. I don't know that I should hardly have thought her capable of transacting business before that attack. She never had been in the habit of transacting business before the attack ; and we thought she could'nt. Perhaps she was as capable of business at the time of the attack as she had been for several years before. I think her mind seemed to be gradually on the decline before the attack. She did not appear to enjoy company and visiting as she had done. I think there was no other evidence of her mind's declining. She had been calling me Nancy Evans ever since she had the attack; it was about ten days after the attack, or as soon as she could speak so as to be understood, that she began calling me so. She didn't know me at all. From the time of the attack to the day Worth and Davis were there she did not know me at any time. I was in the parlor when they came to the door. Amy Rickey was up stairs in her room. They wished to see her. My sister Amy Ann went up and told her there was company there and wished her to come down stairs. I believe Amy Ann brought her down. I was in the parlor when grandmother came in. Mr. Worth and Mr. Davis were in the parlor when she came in. She spoke to them. I don't recollect that she called them by name. I think not. I am clear she did not. I went directly out when she came in. I was not in again to stay, but only passed through

the room.  I was preparing for dinner.  After that grandmother did not come down very often ;  once in a few days or a week perhaps.   The day Mr. Clark was there she came down and took a little dinner ;  sat down at the table.  She had dined before, up stairs.  She remained down until they went away.  Elisha Clark, a son of Joseph Olden Clark was there.  I did not tell him a story about his father.  I don't think grandmother knew them while they were there.

*In Chief.*  When Mr. Davis was standing there with the paper I had just gone in the room ; and I stopped at the door to hear what he said.  I stayed until he turned from her.  I dont think her memory at the time of the attack was as good as it was when she was twenty years younger.  There had been no decay in her faculties ; and very slight change in her memory, if any. For two years before the attack I think her mind was not as strong as it had been before.  I think she talked as sensibly as formerly, nearly or quite.  Since the attack she has never been able to talk sensibly as she formerly did.

*Cross Examined.*  For two years before the attack she could not recollect things as long as she had formerly done.  The change in her memory before the attack was very slight.  I have no other reason for supposing her mind was not as strong but this slight change in her memory.  It was in recollecting times and places she had visited, rather than in the names of persons.

*John S. Taylor*, for the complainant.—I have been acquainted with Amy Rickey 7 or 8 years, and perhaps longer.  Have attended her as her family physician.  Attended her in 1844 when she was sick.  Her attack was congestion of the brain, or incipient apoplexy.  I found her in a state of insensibility, and convulsed.  The attack I supposed at the time to be a severe attack.  She recovered from it better than I anticipated.  Her speech was gone, totally.  Think she did not recover it when I left, the first visit ; she was unconscious then.  The muscles of her face were convulsed, and the arms.  I saw her the next day ; I think she had then partially recovered her speech ; but it was

with some difficulty she could converse so as to be understood. There was a partial paralysis of the muscles of one side of the face. My impression is that the second visit was the last I made her. I think I saw her between the time of the first and second attack. I think it was two or three months after the first, that I was called to visit her under a second attack. It was of a similar character as the first, though not so violent. She was insensible and convulsed. The second or third attack was severer than the first, and I bled her ; but the symptoms not yielding I opened her arm again : on reflection, this may have been the second attack. I think she had one of these attacks within a year : five altogether, if I remember right. These attacks are all attended with congestion of the brain. Such attacks for a time impair the mind of any one ; in some it has a more permanent effect ; debilitates the mental faculties : on old persons they are apt to be more permanent. The ordinary effect of a series of these attacks is to impair the mind, and destroy it ultimately. In the situation in which she was at the second visit I made at the first attack, she was not capable of transacting business. She knew enough on my second visit to put her tongue out when I asked her. I should not think she could have been competent to transact business a fortnight after : but I did not see her. Her mind became more impaired as she had those repeated attacks.

*Cross Examined.* The first attack was the 16th Feb., 1844. It was not very long before this that I had seen her. I had been in the habit of seeing and conversing with her before this. My impression is, that before this her faculties were as good as persons' generally at her age : they were failing, as persons generally do in age. She would ask me two or three times while I was there how many children I had. She asked me once who I had married, though she had known before. Don't know that she seemed conscious of the failure of her memory. I remember once she asked me three times how many children I had. I always answered the questions as often as she asked them. I hardly know whether prior to this attack I would have thought her capable of transacting business or not. I don't know, could'nt say whether I thought her competent or not. At the second visit on the first

attack she was but partially recovered.   I gave directions to the family what remedies to apply and let me know if any thing occurred.   Judging from the condition in which I left her, I should think it would require more than two or three weeks to enable her to recover sufficiently to be capable of transacting business.   The attack under which she was suffering then so affected her mind that my impression is she has never been so well since.   I have known instances of persons recovering entirely from such attacks. I have not the date of the second attack : think it was in the summer; probably July.   I don't recollect when the other attacks were.

*In Chief.*   The instances of recovery from such attacks were young persons.   Mrs. Rickey I should take to be between 80 and 90 at that time.   They did not partake of the character of epilepsy, except so far as they produced convulsive action.   By way of explanation to a former answer, when I said I doubted her competency to do business a fortnight after her first attack, I meant extraordinary business, such as required a process of reasoning, as executing a release or disposing of property ; that is, business which females are not in the habit of transacting.

*Question by Mr. Vroom :* If, at the expiration of a fortnight after the first attack, Mrs. Rickey had been told that Mary Olden was dead ; that she had died without a will ; that a will had been prepared for her, shortly before death, in which no part of the property had been given to her ; that the will was left unexecuted by her in consequence of her inability to sign it ; by reason of which she Amy Rickey became entitled to a portion of the estate ; and had then been asked whether she was willing to execute a release, so as to carry out the intention of Mary Olden ; was the old lady competent to execute a release under those circumstances and for those considerations ?   *Ans.*   My opinion is she was not, judging from the state she was in when I left her.

*James B. Coleman,* for the complainant.   I am a physician, residing in Trenton, and have been for a number of years.   I am acquainted with Amy Rickey ; have had some knowledge of her

all my life; have seen her repeatedly. I saw her at Mr. Joseph Abbott's, about 1838. I recollect I was comparing her situation as it then was with what it had been some years previous: there seemed to be a bluntness or obtuseness of the faculties. She asked me a great many questions which I looked upon as childish. In former years as I had known her, her mind was active. I have been present at part of the examination of Dr. Taylor, and heard his evidence read. The effect of an attack of the character of that described by Dr. Taylor, at that age, is generally fatal to the healthy action of the mind. The reason why I give the opinion is this: in old people some change has been effected in the substance of the brain which induces the attack: this change having taken place there is no power in the system to restore the structure to its healthy condition, and the patient is subject to repeated attacks. The mind never wholly recovers from the first attack. The perceptive faculties may be somewhat active; but the higher powers—the reasoning faculties are never entirely restored. I would say from what I know of such attacks and from what I know of this attack from the relation of Dr. Taylor, that the subject of it would not be competent to transact important business a fortnight after it. Persons in such circumstances will often recognize acquaintances, and call them by their names, though not be able to exercise the reasoning faculties. The power of recognition is generally the last to leave the mind. I saw Mrs. Rickey yesterday; her mind was then imbecile. I had not seen her from 1840, that I recollect, until yesterday. She could not call me by name, but inquired after my sisters, and said I recollect them—they are older than I am. Their ages are under 40, and she over 90.

*Sarah Ann Hewes*, for defendant.—Has known Mrs. Rickey from a child. The last time she saw her was in July, 1845, on a visit at Mr. Abbott's. Witness went there expressly to see her; had been in the habit of going to see her occasionally; but had not seen her for rather more than two years before. Sarah H. Clark, Martha Clark, Elisha Clark and a little girl named Mary Davis was with witness on her visit to Mrs. Rickey's above mentioned. We all went expressly for the purpose of paying a

visit to Mrs. Rickey. Thinks it was about 12 o'clock when they arrived at Mr. Abbott's; but they did not see Mrs. R. until about 2 o'clock, at dinner. We saw Mrs. Abbott when we first arrived there. We immediately inquired after Mrs. R. Mrs Abbott told us she was quite poorly then; said she had been taking medicine and there was not much satisfaction in seeing her. We were sitting at the dinner table when Mrs. R. came down to it. She knew us when she came in and each one of us : shook hands with us; called us by name, and said she was glad to see us. We were just finishing our dinner. She sat down with us and I think eat a little dinner. She sat down with us I know. We left there between four and five in the afternoon. She was with us all the time until we left; during the whole of the time she was conversing with witness and witness's friends, and appeared to enjoy our company. She appeared entirely herself as she used to be. Witness did not notice any difference. She inquired about her friends at Princeton : that she did two or three times in the afternoon : and she observed that she was forgetful. In the course of the afternoon she inquired after several of our neighbors and friends. I cannot remember the conversation distinctly, but it was very much as it had been formerly. She inquired particularly about the Miss Brearleys, who were our neighbors, and spoke of their mother. She conversed freely, and we had an opportunity to judge of the state of her mind. I considered her mind to be in perfect order. I had seen her about two years before when she showed a want of memory. She had been in the habit for years of saying she was forgetful. I thought her on the day we saw her capable of transacting business. Recollect her telling Elisha Clark a story about his father. I found her much better than what I expected in consequence of what Mrs. Abbott had told us. I can't think that I saw anything to lead me to suppose her mind had failed; nothing but want of memory ; nothing to lead me to think but that she was perfectly conscious of what she was doing. Mrs. Abbott was not very well at the time, and we thought she received us rather coolly. We attributed it to her being unwell. We were not received with the cordiality with which we usually had been. Our reception was so cold as to make it a matter of remark

among ourselves ; it was a length of time before we were asked to take off our things. Mr. Abbott and one of the daughters came in the room to see us ; none of the sons came in the room where we were. The youngest daughter, Elizabeth, was sick. Our visit was entirely to Mrs. Rickey; and had nothing to do with this controversy : this matter was not in our thoughts while we were there ; and never thought that had occasioned the coolness until after we left.

*Cross Examined.* Had not seen Mrs. Rickey for about two years previous to the visit above mentioned. It was on a visit to Mr. Abbott's when I saw her. I was not in the habit of visiting there very frequently. I saw Mrs. Rickey and conversed with her at that time. I had heard of her sickness before I went there to see her in 1845 : had heard of it some time before. Am not related to Mrs. Rickey. Mrs. Clark, my aunt, is connected with her by marriage. Mr. Clark's first wife was a sister of Mrs. Rickey. Mrs. Clarke's family is distantly connected with Mr. Davis by marriage; but not at all related. On the occasion of the visit we made to Mrs. Rickey, we left there between four and five o'clock. Have not seen Mrs. Rickey since. Does not recollect exactly when she communicated to Mr. Davis what she knew about Mrs. Rickey. It has not been more than a month that she had any idea of coming here as a witness. Did not see any alteration in Mrs. Rickey's mind on my visit to her in 1845. Had heard of her sickness, but does not remember of any particulars. She entered into conversation upon different matters. Did not see any thing that day to prevent her transacting any business. Did not see that her mind was impaired—but that she was free to transact any business. On my visit to Mrs. Rickey there was nothing said about Mary Olden's will—no reference to it in any way ; but only about the change that had taken place in the neighborhood in consequence of her death.

*In Chief.* At that visit, in our conversation, Mrs. Rickey alluded to the death of Mrs. Davis as well as that of Mary Olden. The little girl with us on that occasion was a daughter of Mrs. Davis. She said she did not care about visiting Princeton in

consequence of these changes. Mr. Davis came to my aunt's last Saturday and spoke of my coming as a witness. He inquired about my visit to Amy Rickey's, and we talked it over at that time. I had never had any conversation with Mr. Davis on the subject of the said visit until Saturday last. About a few weeks ago, a friend of mine, but not Mr. Davis, stated to me that perhaps I might be called upon as a witness: it was Mr. Worth. I said I thought not. I was at his house, and we were talking about my visit to Mrs. Rickey, when Mr. Worth so stated to me. After Mr. Davis had come from Mr. Abbott's about the release, he spoke to witness about this business: it was in the evening of the same day. From that time until last Saturday witness has no recollection that Mr. Davis has ever said anything to her on the subject.

*Martha Clarke*, for the defendant. Have known Mrs. Rickey since 1822; and have been in the habit of visiting her occasionally. The last time I visited her was in July, 1845, in company with Miss Hughes. We met Joseph Abbott at the gate. When we got to the house we saw Ann Abbott. We inquired for Mrs. Rickey. The reply we received was, that she was not well. Mrs. Abbott said Mrs. Rickey was not well, and we could not have much satisfaction—she could not enjoy our company, or something of that kind. It was about two hours before we saw Mrs. Rickey. We were received by Mrs. Abbott coolly. When Mrs. Rickey came into the room she knew me : she knew us all, she called us by name, and told us she was glad to see us. She asked us who the little girl with us was. We told her. Then she remarked it was Acsah's (Mrs. Davis's) child. The little girl was four years old. Mrs. Rickey remained with us until we left, which was about five in the evening. I had not seen her before since she was in Princeton, two or three years before. I did not perceive any material change. She conversed with as much intelligence as she did when I had last seen her. I thought her capable of transacting business. She complained of her memory being weak. She had done so on other occasions when I had seen her. Did not see any reason why I should not have enjoyed my visit to her as much as I ever did. Mrs. Abbott was

in the room the greater part of the time of my visit and took part in the conversation. I have not seen her since.

*Cross Examined.* Did not discover at that time that Mrs. Rickey's mind was impaired, but was as sound as it ever was. I have not taken any interest in this controversy. I am connected with the family of Mrs. Davis, and am intimate with them. I mean that my family and the family of Mary Olden are connected, and intimate. Mr. and Mrs. Davis in her life time were members of Mary Olden's family. My husband was the nephew of Mrs. Rickey.

*Josiah S. Worth,* for defendant. Mr. Davis and I went together to Joseph Abbott's to obtain a release from Amy Rickey, in Mar. 1844, shortly after the death of Mary Olden. I had had an acquaintance with Amy Rickey all my life : she was very intimate in the family. I accompanied Mr. Davis to the house of Jos. Abbott. Jos. Abbott came to the door and received us. He took us into the house. I can't say whether there was any person in the room; his daughter might have been there, but no other person. After sitting a short time and making the usual inquiries about health, &c., Mr. Davis invited Mr. Abbott out in the entry, and they went into the entry. I was not present with them in the entry, and heard no part of the conversation between them. Amy Rickey, I think, came into the room while they were in the entry. She came up and spoke to me, and called me by name, and said, poor Mary is gone; and then said, how is thy mother ? is she gone also? I told her yes. She said her memory was so bad that she scarcely dared ask a question. I had not seen her before since the death of Mary Olden. I had no other conversation with her at that time. Mr. Abbott and Mr. Davis came in directly after the conversation above detailed. When they returned, either Ann Abbott came in with them or directly after—about the same time. The conversation, when they came in, soon turned on the release; and Mr. Davis took it from his pocket or hat, and read it. After he had read it he laid it on the table by where Amy Rickey was sitting. Jos. Abbott got up from where he was sitting and went round and got a pen

and ink, and took it, and put it on the table where she was sitting. I cannot identify the conversation which took place previous to this time. Amy Rickey took up the pen, and observed, " it was not intended for me, nor I'll have none of it," and turned round to her daughter and said, " ought I ?" And she answered, no, by no means. Then she commenced signing it. After she had signed it, and looking it over, she said she had left out a letter. Some one in the room, I think, observed, it made no difference. She said yes, and put it in with her own hand. I do not know what letter it was, and have not seen the release since. Jos. Abbott and I are the witnesses to the release. The release is here shewn to the witness, and he identifies it. After the signing, Mr. Davis said to her, what shall I give you aunt Amy. She said nothing. He then handed her a ten dollar note ; but she refused taking it. He then said, take that as a present from aunt Mary ; and then Anna Abbott said, mother is not in any way necessitated. There might have been some other conversation, but I don't recollect it. We came away immediately after. This was before dinner : we did not dine there : we had engaged our dinners at Snowden's before we started to Jos. Abbott's. Before Amy Rickey signed the release, Mr. Davis fully explained to her the reasons why she was asked to sign it. They told her they were desirous of settling Mary Olden's estate as near her will as they possibly could. He told her that Mary Olden had máde a will which she had not executed. He stated to her, that in consequence of Mary Olden not having executed her will she Amy Rickey would be entitled to a portion of her estate. I was led to believe at the time that the family understood the case perfectly. This conversation was all previous to Amy Rickey's taking her pen to sign the release and making the remark that it was not intended for her. Mr. Davis read the release without interruption from any one. While he was reading it, Jos. Abbott did not say that there was no use in reading it, that she could not understand it. I was in the room the whole time. I was seated between Mr. Abbott and Mr. Davis ; and Amy Rickey was sitting the other side of the room. I did not hear any intimation from Mr. Abbott or Ann Abbott that Amy Rickey did not know what she was about. Ann Abbott observed, at some time while

we were there, that mother had lost her memory and was very for-
getful. I supposed, at the time that Amy Rickey signed the re-
lease, that she understood perfectly what she was doing. I thought
so from her observations and the way she appealed to her daugh-
ter for her approbation. That was my impression at the time.
I knew her memory was very much impaired : I had observed
that before. I have never had any reason to change my opinion.
I have never seen her since. By the manner she addressed me,
and the inquiry she made, I thought she understood herself per-
fectly.

*Cross Examined.* After Mr. Davis and Mr. Abbott came into
the room, witness does not recollect that Amy Rickey took any
part in the conversation or said any thing about it. The conver-
sation was principally between Mr. Abbott and Mr. Davis.
Amy Rickey was very attentive to it. Before that, I think Mr.
Davis told her that in consequence of the non-execution of the
will she would be entitled to some portion of the estate. He
cannot undertake to give the conversation in its language precise-
ly, but gives the substance of it, as he was impressed with it at
the time. Mr. Davis did not state in the conversation the time
when the will was written. I think he stated that the estate was
left to her nephews and nieces. Does not recollect that he stated
that anything was left to Amy Rickey. Does not think he stated
any reason why the will was not executed. Has no recollection
that he stated that Mary Olden had made other wills before.
After they came in from the entry I think Mr. Abbott mentioned
to Amy Rickey what Mr. Davis wanted of her, and what the ob-
ject of his visit was. I cannot detail that conversation. I did
not hear any thing said by Mr. Davis about giving five dollars ;
he offered her ten dollars and she declined taking it. He then
said he would give her the ten dollars as a present from aunt Ma-
ry, and she refused to take it. He then left it on the table. The
release being shewn to witness, he says he does not know in whose
hand writing it is. The word " ten," in the fifth line of the re-
lease, he believes to be the hand-writing of Mr. Davis ; it was
put there I think after the release was executed and after he gave
her the ten dollar note. By executed, I mean after it was signed

and witnessed. I heard of no money mentioned until after the execution of the release. Amy Rickey took the money, at least it was left on the table. I think I saw it afterwards in her hands, but I wont be certain of that. He asked her first what he should give her. She said nothing. He then gave her a ten dollar note. Does not recollect that the old lady asked Mr. Davis what that was for when he gave her the ten dollars. Does not remember that he and Mr. Davis talked the matter over on the road from Jos. Abbott's to Trenton; thinks something might have been said about it. When I said, in my examination in Chief, that I believed the family perfectly understood the case, it was because there was no disapprobation expressed; that was one among the reasons. The family seemed perfectly willing that she should execute it. Ann Abbott said that she ought not to have any of it, meaning the property. Jos. Abbott said nothing against it; and went to get the ink and materials for Amy Rickey to sign, without being asked to do it. All the movements of the family left that impression. These were the reasons which produced the impression above stated on my mind. When the release was executed, I understood the share was to be transferred by the release to Mary Olden's estate. I cannot say that the family understood; they said nothing to the contrary. *Ques.* Was there any thing said at that time about any other person signing off. *Ans.* Does not recollect that any thing of the kind was said; or that any other person had signed off; or that any thing was said about any other person but herself. Witness is related to all the parties concerned. His mother and Amy Rickey were first cousins. He is security on the administration bond of Mr. Davis: Charles Olden is the other security.

*Elisha Clarke*, for the defendant. Is nearly 23 years of age. Is the son of Martha Clarke, who has been examined as a witness in this case. Knows Amy Rickey. Accompanied his mother and others on a visit to Amy Rickey's in the summer of 1845. We went to Jos. Abbott's on a visit to Amy Rickey. It was about one hour after we got there before we saw Amy Rickey. We were at dinner when she came into the room. She appeared to know us all. I am not positive that she called us all by name, but I think

she did. I remember her calling my grandmother by name, calling her Sally Clarke. I am rather under the impression that she did call them by name, speaking to them: I am positive about grandmother. She appeared to know me, from her remarks, that I had grown considerably since she had seen me last; that I looked very much like the Clarke family. It was some time since I had seen her before; two or three years I should think. She inquired who Mr. Davis's little girl was. She knew who she was after being told. She mentioned the child's mother's name; spoke of her as Acsah Ely. We were partly done when she came in. She sat down at the table. She remained in the room. After dinner we went into the parlor: she went along with us. She took part in conversation; appeared to have the use of her faculties; appeared to understand what was said to her. I cannot tell whether she was capable of judging of any business. She appeared forgetful, and would sometimes ask things over twice; but I suppose if any thing was stated to her explicitly she would have understood it.

*Cross Examined.* I did not remain a great while in the parlor—only a short time. Can't remember what took place in the parlor, except a little anecdote that Mrs. Rickey told me about the fondness of the Clarke family for horses, an anecdote that she had been in the habit of telling me ever since I had been acquainted with her. It was some two or three years before that since I had seen her. I was not able to perceive much of any change in her faculties; not much change. I judge from her general conversation; from the remarks she made once in a while. I have not seen her since.

*William Forman,* for the defendant. I reside in Princeton. Am a physician; and have been between 30 and 40 years. I have read the testimony of Dr. Taylor and Dr. Coleman in this case. I have no personal acquaintance with Amy Rickey. I do not see anything in the circumstances stated by Dr. Taylor that would necessarily have prevented her from transacting business two weeks after the attack spoken of. An opinion might now be formed as to the effect of this attack two weeks after; but it

would be mere conjecture. This I would say in explanation. No rule, I think, can be laid down in regard to diseases of the brain as influencing the moral and intellectual powers of such general application as would justify a conclusion in any particular case. I mean the opinion must be made up on such vague grounds that it would not be worthy to be received. I can only see in the testimony of Dr. Taylor a description of symptoms which in many cases would impair the moral and intellectual powers so far as to justify him in thinking that they might have done so in the case of Mrs. Rickey. *Ques.* What do you understand by incipient appoplexy? *Ans.* To my mind the term conveys no definite idea. Appoplexy is generally preceded by symptoms which indicate its approach : when they result in loss of consciousness, sensation and all the mental and moral faculties, the patient labors under the disease. *Ques.* When the mind of an old person is impaired by an attack of this kind, do the reasoning powers in all cases fail before the perceptive faculties? *Ans.* I do not know that they do. I have seen it stated recently, but can't tell where, that the power of associating, comparing and judging, remain some time after the perceptive faculties are in a good degree suspended. The reasoning powers are, according to my observation, impaired in a greater number of cases, and more than the perceptive faculties. *Ques.* Do you see in the testimony of Dr. Taylor any evidence of that change having been effected in the substance of the brain of which Dr. Coleman speaks? *Ans.* I do not, further than that the presence of apoplexy implies an altered condition in the circulation of the brain, or a morbid excitability in the organ itself. *Ques.* Have you known any instances where old persons have retained their reasoning powers while their perceptive faculties had failed? *Ans.* I have no recollection of any such cases.

*Cross-examined.* *Ques.* From the description given by Dr. Taylor, in the evidence, what would you call the attack of Amy Rickey? *Ans.* I should say she had some of the symptoms of apoplexy. *Ques.* Is not the effect of an attack of that character generally fatal to the healthy character of the mind of a person of Mrs. Rickey's age? *Ans.* Generally. That effect is

caused by some change or lesion produced in the brain itself. I am not aware that a change or lesion in the brain would produce apoplexy itself ; such a change or lesion in the brain may be indirectly the cause and directly the effect of apoplexy. I know of but two causes of apoplexy—irritation, and compression of the brain. There is a difference in the effects of apoplexy produced by these different causes. Apoplexy from compression is decidedly the most dangerous. One form of compression is produced by hemorrhage within the cavity of the cranium. This form of apoplexy, or apoplexy from this cause, if the hemorrhage be very extensive, is almost always fatal. Compression from mere fulness or congestion of the vessels of the brain, producing apoplexy, is frequently recovered from. In speaking of these effects from which there may be a recovery, I mean to be understood of the mind as well as the body. Recoveries will more probably take place in young persons than in old. I have never seen an apoplectic seizure in a person of her age, (Mrs. Rickey's.) I have no distinct recollection ; but old persons do sometimes recover from apoplexy. I think we have cases recorded of old persons recovering from apoplexy and of being restored to the vigor of mind equal to that at the time of the seizure. These recorded cases are the exceptions and not the rule. *Ques.* Do you know of any old person of the age of 85 or upwards, after having had one attack of apoplexy and subsequently a second one, that in the interval recovered the whole powers of the mind, as before the first attack? *Ans.* Not personally ; nor do I at present recollect such an instance ; nor in case of epilepsy. *Ques.* Does extreme old age debilitate the function of the brain as much as it does the other functions, as, for instance, the action of the muscles, sight, hearing, taste, &c. ? *Ans.* I would say that an impairment of the functions of the brain is generally associated with extreme old age ; I have no other answer to give to this question. *Ques.* Would the conclusions derived from reasoning on the causes that produce these attacks, in very aged persons, be in favor of a complete restoration of the mind after an attack as described as Mrs. Rickey's case ? *Ans.* Generally not. *Ques.* Could the causes that produce the attack or fit, in a person of that age, be removed by the fit ? *Ans.* A person

may recover from the fit, but whether the fit is the cause of the recovery I cannot say. *Ques.* When the attack is produced by congestion, and the congestion be not removed, can the patient recover? *Ans.* The congestion may be removed by the subsidence of the cause which produced it. *Ques.* Is the mere memory of persons and their names a sufficient evidence of mind to transact business of any importance? *Ans.* I think not. This power of recognition of names and persons may in some instances be retained when the powers of reasoning may be very greatly impaired. I think the power of associating might exist in a limited degree without the power of reasoning closely. I am not able to answer whether the power of recognition and association do exist in the lower order of animals which are not supposed to have reasoning powers. *Ques.* What are the changes produced on the brain by age, if any? *Ans.* I do not know that there are any changes produced necessarily on the brain by old age. The brains of very aged persons are said to be of firmer consistence than in younger ones; I cannot tell what effect that would have upon the functions of the brain.

*In chief.* I am not satisfied entirely of the nature of the disease from the testimony of Doctor Taylor. If I were to judge from the facts which the Doctor has stated and from what he has not stated, I should think the case not sanguineous apoplexy. By sanguineous apoplexy I mean that form of the disease which results from extravasion or engorgement. Doctor Taylor not having stated the previous condition of the patient, I am not clear as to the nature of the attack. I should think it was what some pathologists term nervous apoplexy. Supposing this to have been a case of nervous apoplexy, I should think there would be much more likely a recovery than from an attack of sanguineous apoplexy. The first faculty usually impaired in the progress of age is memory. I have known old persons whose memories have become very much weakened, while their other faculties have remained in a great measure unimpaired. I have several times witnessed such cases, and I believe they are of frequent occurrence. I have known persons very old who possessed very good intellectual powers, very strong intellectual powers; whether impaired

or not I cannot tell, not knowing them in their youth. *Ques.* Have you known persons of very advanced years whose faculties have exhibited no signs of decay except memory ? *Ans.* I can not recollect of any instance in my experience when a person of middle age had two attacks of apoplexy and where in the interval the faculties were fully restored. I am perfectly satisfied there have been such cases.

*Cross-examined.* This nervous apoplexy grows out of irritation.

*J. S. Schanck,* for the defendants. I am a physician, residing in Princeton. Have no acquaintance with Amy Rickey ; have read the testimony of Doctor Taylor in this case. From the facts stated by him I think he has not given sufficient data, for a certainty, for diagnosis, as to what the disease was. I would be much more willing to say what I think it was not, than what I think it was. I should think it was not a case of apoplexy, as the term is ordinarily understood by medical men. All the symptoms given by Doctor Taylor may be attributed to other causes than sanguineous apoplexy. The treatment seems not to have been such as sanguineous apoplexy would have called for. The fact that the patient was well enough the next day not to need the services of the practitioner would indicate the same. I think she may have transacted the business she was called upon to transact two weeks after the attack. I think that she may or may not have been able to transact business at that time ; judging from the statement of all the circumstances of her case by Doctor Taylor, she may or she may not have been able. She may have been as capable of transacting business two weeks after that attack as before; though I would expect some slight impairment of her faculties. I think that memory is among those faculties that first fail ; and old persons are often themselves conscious of this. *Ques.* Have you known old persons whose memory was very much enfeebled, but whose other faculties remained in a great measure unimpaired ? *Ans.* I have not. I have known old persons whose memories were much enfeebled, but whose other faculties were such as to enable them to transact ordinary business.

*Cross-examined.* I should think the business she was called upon to transact so far extraordinary as that females of her years are very rarely called upon to transact such business; but not extraordinary when the faculties necessary to transact such business are in question—not such as to require extraordinary reasoning powers. *Ques.* What business could she have been engaged in that would have required higher reasoning powers than that she was engaged in? *Ans.* Such as the counsel for the complainant is now engaged in. *Ques.* What business did you understand she was engaged in? *Ans.* I understand the law of this State to have given the old lady a certain amount of property; that this was entirely unexpected to her; that this was not the wish of the former owner of that property; that all this was known to the old lady; and then she was called upon to say whether she would take advantage of what the law gave, or permit it to go to those for whom it was intended. I should call it a mere choice, not any high degree of intellectual exercise, to arrive at the conclusion she came to. I should think it indispensable that she should understand fully the premises that I have just stated. I have not understood what was the amount of that property the law had given to her; I should think it would make no difference whatever whether the property was large or small. She probably decided, not from *lex*, but from *jus*—upon what she considered right rather than upon law. From what I know of her circumstances I should presume she may have been capable to contract for a farm or property. *Ques.* Is that probable or otherwise? *Ans.* In a lady of her age, rather improbable; but certainly very possible. I should think this attack was less like epilepsy than apoplexy. There are so few facts given I can hardly decide what the attack was. Such attack may be induced by immoderate quantity of indigestible food; temporary congestion of the brain; and, in cases of children, from teething. I would say the facts stated by Doctor Taylor are not inconsistent with the case being apoplexy. The convulsive movements, however, mentioned by him do not usually attend sanguineous apoplexy; and, further, that the symptoms mentioned by Doctor Taylor are but little more like apoplexy than profound intoxication, or *coma*, from large doses of opium. Doctor Taylor, as

attending physician, was better able to judge of the nature of the disease than I can be from his recorded testimony. **Ques.** Was he not better able to judge of its effects? *Ans.* Perhaps he was ; but, inasmuch as the disease required only another visit, and then it was, so far as I know, a considerable time before medical aid was again needed, I think the effects could not have been such as would necessarily follow an attack of decided apoplexy ; and, further, in my opinion, a lady of her age could not live through repeated attacks of decided apoplexy.

*P. D. Vroom* and *Stacy G. Potts* for the complainant. They cited 5 *John. Ch. Rep.* 173 ; 2 *Cowen,* 129 ; 1 *Story's Eq.,* sec. 217, 218 ; 1 *Ball & Beatty,* 171, 181; 3 *Swanst.* 399 ; 1 *Vern.* 32; 1 *P. Wms.* 239 ; 2 *Ib.* 202; 2 *Bro. Ch.* 151 ; *Coxe,* 333 ; 1 *Ves.* 125, 7 ; 2 *Scho. & Lef.* 474, 486.

*R. S. Field* and *W. Halsted* for the defendants. They cited 2 *Eng. Eccl. Rep.* 72, 97 ; 1 *Adams's Rep.* 162 ; 1 *Halst. Ch.* 361 ; 4 *Ired.* 465 ; *Gresl. Eq. Ev.* 159 ; 1 *Story's Eq.,* sec. 251, 329 ; 4 *Sim. Rep.* 182 ; 2 *Myln. & Keen,* 473 ; 8 *Eng. Cond. Ch. Rep.* 87.

THE CHANCELLOR.  I think the proofs show satisfactorily a want of mental capacity in the complainant to make a valid release.

Decree for complainant.